CAMPEAU GOODSELL SMITH, L.C.
SCOTT L. GOODSELL, #122223
WILLIAM J. HEALY, #146158
440 N. 1st Street, Suite 100
San Jose, California   95112
Telephone:  (408) 295-9555
Facsimile:   (408) 295-6606

ATTORNEYS FOR Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: | Case No. 09-51900 ASW |
| BENYAM and PAULA R. MULUGETA, | CHAPTER 11<br>R.S. No. RKO90014 |
| Debtors. | |
| | Hearing Date: September 22, 2009<br>Hearing Time: 2:00 p.m. |

**OPPOSITION TO MOTION FOR RELIEF FROM STAY**

Debtors BENYAM and PAULA R. MULUGETA (jointly "Debtors" ) submit this opposition to the Motion For Relief From Automatic Stay filed by Wells Fargo Bank, National Association As Trustee For The Certificate Holders Of Structured Asset Mortgage Investment II Inc., Greenpoint MTA Trust 2005-AR3, Mortgage Pass-Through Certificates, Series 2005-AR3 ("Wells Fargo Bank") regarding Debtors' real property commonly known as 1339 Sevier Avenue, Menlo Park, CA 94025 ("Sevier") as follows:

**I.  Introduction And Statement of Facts:**

Debtors are the owners of seven (7) distinct residential and commercial properties, generally described as follows:

*Harker (Debtors' residence-a 5 bedroom 3 bath property located in Palo Alto);

Debtors are in the process of loan modification with their lender and readying the property for lease at a monthly rate sufficient to pay their lender. Debtors would move to the cottage on the property.

*Harrison (a 5 story, 156 room hotel located in Oakland);

See below.

*Grand (a four story 21-unit apartment building with 4 associated commercial units);

The obstructing tenant was removed from the premises pursuant to settlement of an unlawful detainer matter, the property has been and is subject to ongoing repairs, all four commercial units are rented, 14 of the 21 residential units are rented, and Debtors anticipate completing repairs and renting the remaining 7 residential units by November 2009. Debtors have been making monthly payments to their lender Sterling, Sterling recently inspected the property, and in approximately November 2009 begin making payments to the junior secured creditor. Debtors may place Grand for sale.

*O'Keefe (a 21-unit apartment building located in East Palo Alto);

Debtors have rented all but 1 unit, have been making payments to their lender Sterling, have agreed to make Sterling available for Sterling's inspection as necessary, and anticipate making monthly payments to the junior secured creditor in approximately November 2009.

*Chaucer (2 single family homes (duplex) located in Berkeley);

Debtors have rented both units with paying tenants, are working on a loan modification with their lender, and anticipate making monthly payments to their lender.

*Sevier (a single family residence located in Menlo Park used as a rental property);

See below.

*Brann (a single family home used as a rental).

Debtors are working with the property's lender to modify the loan so the income is relative to the property's value and ability to generate actual income.

## II. Bankruptcy.

Debtors commenced this case on March 18, 2009, for two primary reasons: first, conversion of the hotel at Harrison from a residential hotel to a commercial hotel increased Debtors' debt, impacted their cash flow, and drained resources and second, the primary lender on Harrison, immediately upon learning of a pending sale and escrow for Harrison at $7,000,000, significantly more than its first lien of approximately $3,500,000, moved for appointment of a receiver. Debtors first retained counsel on April 2, 2009, submitted to an Initial Debtor Interview and a Meeting of Creditors scheduled for April 22, 2009, and amended schedules and provided information as requested by the United States Trustee. Debtors have been filing monthly operating reports and working to repair, sell, and/or rent their properties..

**A. Sale of the Harrison Hotel/Relief From Stay.**

Pre-petition Debtors entered into a contract to sell the Harrison hotel for $7,000,000 to Trading Spaces, LLC as part of series of real estate purchases by Trading Spaces, LLC following an appraised "as is" value of $8,100,000 and a projected value after renovation at $14,310,000 (April 17, 2009). Debtors believe Trading Spaces, LLC has the ability to close this transaction and the transaction is in the best interests of secured creditors, unsecured creditors, and Debtors. Debtors anticipate at least $2,000,000 in net proceeds from the sale of the Harrison hotel. Debtors anticipate using the sale proceeds to address its post-petition and pre-petition arrearages and debts and exiting bankruptcy by way of a dismissal or plan.

The Court approved Debtor's motion to sell the Harrison hotel to Trading Spaces, LLC Pursuant to an addendum, this transaction was to close on or before August 15, 2009. However, Trading Spaces, LLC did not close as anticipated due to delays in a bond rating by Moody's.

Lone Oak Fund, LLC. ("Lone Oak"), holder of the first mortgage on the Harrison hotel, sought and secured relief from stay effective the close of business on October 2, 2009, a date that the court could extend for good cause.

On September 4, 2009, Debtors filed a motion to extend the October 2, 2009 relief from stay date primarily because the Trading Spaces' transaction had not closed as anticipated and

Debtors had secured a back-up transaction with R. K. Relan ("Relan") to purchase the Harrison Hotel for $7,000,000 with a 45 day close. Debtors also filed a motion to approve the sale of the Harrison hotel to Relan. Debtors have been in negotiations with Relan regarding the Harrison hotel for many months. Relan is aware and recognizes that Debtors are in contract to sell The Property to Trading Spaces, LLC for $7,000,000.00, but the sale did not close as scheduled.

Therefore, Relan has agreed to remain as a back-up offer to Trading Spaces, LLC through 5:00 p.m. on September 10, 2009 at which time Debtors would, if Trading Spaces, LLC has not closed the transaction, terminate the Trading Spaces, LLC agreement for Trading Spaces, LLC's failure to timely close and would accept the Relan offer as reflected in the Purchase Agreement. Pursuant to the terms of the Purchase Agreement Relan would have 45 days to close. The Purchase Agreement provides that on September 10, 2009, Relan would make an initial deposit of $50,000.00, have 17 days to release its loan and appraisal contingencies, once the loan and appraisal contingencies are released increase the deposit to $160,000.00, and submit $4,900,000.00 into escrow for the sale to close. The Purchase Agreement provides that Debtors are to carry back a new second deed of trust at 6% for 5 years simple interest and then a ballon payment. The Purchase Agreement does not require or therefore provide for payment of real estate commissions.

Recently Debtors agreed to allow Trading Spaces until September 25, 2009 to close and agreed with Relan that its offer will move into first position and close on or before November 9, 2009 (45 days from September 25, 2009) if Trading Spaces has not closed by September 25, 2009. Debtors anticipate the initial cash paid into escrow through the Relan sale will be sufficient to pay, at least, the costs of sale, which excludes any real estate commissions, and the secured claims.

**B. Debtors, Secured Creditors, and Unsecured Creditors Benefit From Debtors' Efforts To Sell Harrison And Rent Their Other Properties.**

Debtors have various junior creditors on the various properties, some of which are cross-collateralized. Debtors have opposed and will oppose motions for relief from stay to protect their investments, protect the equity and cash flows associated with these properties,

and protect the interest of these various junior secured creditors.

In particular, a sale of Harrison would, after payment of related secured creditors, provide the estate with substantial funds, approximately $2,000,000.00, from which Debtors could bring their secured and unsecured creditors current. A successful sale of Harrison would have a positive cascading impact on the estate, its creditors, the Debtors, and this case.

**C. Sevier.**

Sevier is Debtors' first property having been purchased many years ago for approximately $60,000. As a result Debtors may experience significant tax consequences if Sevier is subject to foreclosure or sale.

Debtors currently have the property rented at $2,000/month, but the tenant has been sporadic with rent payments.

Debtors anticipate they will be able to make payments of $1,800/month come November 2009.

**III. The Court Should Deny Relief From Stay Through Its Equitable Powers And Allow Debtors Time To Sell Harrison And In Order To Avoid Potentially Severe Tax Consequences.**

One of the primary purposes of the automatic stay is to give "the debtor a breathing spell form its creditors" and "permit "the debtor to attempt a repayment or reorganization plan'. <u>Dean v. Trans World Airlines, Inc.</u>, 72 F.3d 754 (9th Cir. 1995); see also <u>In re LPM Corp.</u>, 300 F.3d 1134, 1137 (9th Cir. 2002) (The automatic stay "grants the debtor breathing room and provides time to attempt reorganization.")

Section 105 of the Bankruptcy Code, entitled Power of Court, provides, in pertinent part:

> "(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this time provided for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." . . .

(d) The court, on its own motion or on the request of a party in interest, (1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and (2) unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically . ."

**A. The Sale Proceeds Of Harrison Should Be Able To Bring Debtors Current On Sevier.**

Debtors anticipate that the net sale proceeds from a sale of Harrison, approximately $2,000,000.00, will be more than sufficient to bring Debtors' current with their various secured and unsecured creditors.

**B. The Sale of Sevier Will Potentially Subject Debtors To Significant, Negative Tax Consequences And Therefore Sevier Is A Necessary Element Of Debtors' Reorganization.**

Debtors anticipate that any sale of Sevier will potentially result in significant and negative tax consequences because Debtors purchased Sevier, their first property, many years ago for approximately $60,000. Therefore, it is not in best interests of the Debtors, the estate, or the unsecured creditors to allow a sale of Sevier at this time.

Further, once Debtors sell Harrison they should be in a financial situation that they could absorb the approximately $600.00 differential between the Sevier's rental income and the current monthly mortgage payment[1].

**C. Debtors Anticipate They Will Be Able To Make Regular Monthly Payments Commencing November 2009.**

Although Debtors have Sevier rented, the tenant has been sporadic with the rent payments. The property is currently rented for $2,000.00. Debtors anticipate they will be able to make monthly rent payments of $1,800 commencing November 2009.

---

[1] Debtors are willing to work with Wells Fargo Bank to restructure the loan for a mutually beneficial solution.

**D. The Balance Of Equities Weighs Against Granting Relief From Stay.**

In the bankruptcy setting, the court balances the following factors: there be a danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize; second a reasonable likelihood of successful reorganization; a balance the relative harm as between the debtor and the creditor who would be restrained; and the public interest-public interest in successful bankruptcy reorganization and other societal interest. (In re Monroe Well Serv., Inc. 67 B.R. 746, 752-53 Bankr. E.D. Pa. 1986) In applying this standard it "is important to recognize that the four considerations are factors to be balanced and not prerequisites that must be satisfied . . . These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." American Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 963 F.2d 855, 859 (6th Cir. 1992) (citations omitted) As a consequence, the overwhelming presence of one of the factors may lead a court to issue, or to deny, an injunction without a particularly strong showing on the others." American Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 963 F.2d 855, 860 (6th cir. 1992) The balance of harms considers evidence as to whether creditor sought to be enjoined has other avenues to pursue relief, and the impact on that creditor by delay.

Debtors submit that the balance of equities weighs against granting relief from stay as the harm to Debtors, their creditors, and the estate by granting relief from stay is much greater than the potential harm to this single creditor by denying relief from stay at this time.

**IV. Conclusion.**

Debtors submit Lone Oak's motion is premature, Lone Oak has equity above its secured claim, proper discovery and a full hearing will establish Lone Oak's equity cushion, Debtors' pending sale of the Merritt Hotel is scheduled to close on or before August 15, 2009 which should result in payment to Lone Oak, and good cause does not exist to grant relief from stay at this time.

Dated: September 21, 2009         /s/ William J. Healy
                                  William J. Healy