SIMON ARON (Bar No. 108183)
WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP
11400 West Olympic Blvd., Ninth Floor
Los Angeles, California 90064-1565
Telephone: (310) 478-4100
Fax: (310) 479-1422

Attorneys for Lone Oak Fund

FILED

APR 1 2 2010

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>BENYAM MULUGETA and PAULA R. MULUGETA,<br><br>Debtor and Debtor in Possession<br><br>LONE OAK FUND, LLC,<br>              Movant,<br>v.<br><br>BENYAM MULUGETA and PAULA R. MULUGETA<br>              Respondents. | CASE NO. 09-51900-ASW<br><br>Chapter 11<br><br>**DECLARATION OF BRIAN K. RAPELA**<br><br>DATE: April 27, 2010<br>TIME: (To Be Set)<br>Courtroom: 3020<br>      280 S. 1st Street<br>      San Jose, CA 95113 |

TO: DEBTORS BENYAM MULUGETA and PAULA R. MULUGETA:

      **COMES NOW**, secured creditor Lone Oak Fund, LLC ("Lone Oak"), and hereby submits the Declaration of Brian K. Rapela in opposition to the Debtor's motion to extend time on Order for relief from the automatic stay and/or motion for authority to sell real property ( 2332 Harrison Street, Oakland, California (the "Harrsion Property")).

# DECLARATION OF BRIAN K. RAPELA

I, Brian K. Rapela, declare:

1. I am over eighteen years old and am employed by Hulberg & Associates, Inc., ("Hulberg") as a Senior Appraiser. I have been employed by Hulberg since 2003. My curriculum vitae is attached hereto as Exhibit "A". I have completed all of the requirements for the Appraisal Institute's MAI designation.

2. My appraisal experience consists of appraising a wide variety of property types including office, industrial, retail, vacant land, self storage and a variety of hotel properties. I have appraised such special purpose properties such as wind farms, athletic clubs, assisted living facilities and convalescent hospitals. A schedule of most recent assisted living facility and hotel appraisals that I prepared is attached hereto as Exhibit "B".

3. Except as otherwise noted, I have personal knowledge of the facts set forth below and, if called as a witness, could and would competently testify thereto under oath

4. I make this declaration in support of Lone Oak's Opposition to the motion to extend time on Order for relief from the automatic stay and/or motion for authority to sell the Harrsion Property filed by Benyam Mulugetq and Paula R. Mulugeta (collectively the "Debtors").

5. Hulberg was retained by Lone Oak to review the written appraisal dated May 3, 2009, prepared by Patrick J. O'Malley, MAI and Nannette F. Quigley of Detailed Analsyis (the "O'Malley Appraisal"), and render an opinion regarding the conclusions reached in the O'Malley Appraisal. In the course of this assignment, I was required to determine the highest and best use for the Harrison Property and therefrom provide an estimate of the Harrison Property's market value.

6. A summary of my conclusions regarding the accuracy, credibility and conclusions reached in the O'Malley Appraisal are set forth hereinafter.

7. The O'Malley Appraisal states on page 1 that the purpose of the report is to "support" a value for acquisition purposes. The O'Malley Appraisal concludes that the highest and best use of the Harrison Property **"as improved"** is for the renovation of the subject into a 156-unit assisted living facility. The O'Malley Appraisal then utilizes three approaches to value

(sale, income and cost approaches) to obtain a "value as complete" for the Harrison Property and then makes deductions in order to arrive at an "as is" value. Major issues arise within the O'Malley Appraisal and with its analysis and conclusion as to the highest and best use of hte Harrison Property and under each of these approaches.

   a. The appraisal report is that of a "self-contained" report, however lacks the necessary descriptions in many areas. There is no market overview section, either pertaining to assisted living facilities or to commercial real estate in general. In April of 2009 (the valuation date) economic conditions had deteriorated significantly throughout the U.S. as well as the Bay Area. Commercial property values decreased significantly and lack of any available financing essentially halted the market in terms of sales. The combination of declining market rents, lack of financing, rising interest rates and investors increased yield expectations caused a significant erosion of commercial property values. The O'Malley Appraisal fails to mention anything regarding the local economy or its effects on property values. Further, there is no market overview for assisted living facilities, the use that the O'Malley Appraisal deems to be the highest and best use of the Harrison Property.

   b. As mentioned, the O'Malley Appraisal concludes that the highest and best use of the Harrison Property, **as improved**, is for the renovation of the subject into a 156-unit assisted living facility. In such a configuration, each room will have no private kitchen or bathroom facilities. This is highly unusual for assisted living facilities and not indicative of the marketplace, as indicated by the comparables used by in O'Malley Appraisal. Therefore, there is significant functional obsolescence in this proposed use that the O'Malley Appraisal fails to adequately address. Further, there are significant legal issues and time delays in converting the Harrison Property, including, without limitation, the following:

       1) According to the current zoning, residential care is an allowable use only with a conditional use permit. The owner has not applied for such a permit. Further, even if the use were granted, the zoning allows a maximum of only 50 units on the subject site, compared to the 156 units that the O'Malley Appraisal is based on; and,

       2) There is no onsite parking for the subject. Residential care use requires

Case: 09-51900   Doc# 249   Filed: 04/12/10   Entered: 04/13/10 08:45:08   Page 3 of 10

some amount of onsite parking. The O'Malley Appraisal mentions that there are 40 off-site parking stalls being leased from a third party but does not mention where specifically, or what the lease terms are. Nevertheless, such offsite leased parking from a private owner would not meet the city's onsite parking requirements.

   c. As such, the O'Malley Appraisal's conclusion of highest and best use as an assisted living conversion fails at the legally permissible level. Furthermore, I believe that any such conversion would not be financially feasible from a cost versus added value standpoint. Thus, I believe that the highest and best use of the Harrison Property continues to be as a residential single room occupancy (SRO) hotel, subject to renovations to the 3rd, 4th and penthouse floors in order to get that space into rentable condition.

   d. <u>Sales Comparison Approach</u>: The O'Malley Appraisal used four sales of assisted living facilities, all of which closed in 2008. Market conditions have declined significantly after the credit crisis of October 2008, yet no adjustments for market conditions were made to any of the sales. In fact, virtually no adjustments were made to any of the sales for differences in locational or physical differences. The most significant difference between the subject property and the comparables is the lack of any private bathrooms or kitchens in the subject, as well as the significantly smaller average unit size, yet no adjustments were made for these differences. As a result, I believe that the Sales Comparison Approach utilized in the O'Malley Appraisal significantly overstated the value of the Harrison Property.

   e. <u>Income Approach</u>: The O'Malley Appraisal used four "comparable" assisted living facilities to determine the market rental rate for the Harrison Property's hypothetical assisted living units. One of these was a convalescent hospital, which is simply not comparable. The O'Malley Appraisal again fails to make adjustments for the subject' property's inferior configuration of common bathrooms and kitchens. The three assisted living "comparable" sales all had mostly private and a few semi-private rooms, but no adjustments to the Harrison Property are made for these differences are in the O'Malley Appraisal. As a result, the O'Malley Appraisal overestimates the hypothetical market rent for the units at the Harrison Property. Furthermore, the O'Malley Appraisal utilizes a 9.0% capitalization rate, which is too low for an

-4-

Case: 09-51900 Doc# 249 Filed: 04/12/10 Entered: 04/13/10 08:45:08 Page 4 of 10

assisted living facility. Historical capitalization rates for assisted living facilities are among the highest of all commercial property types due to their management-intensive nature. Market analysis would suggest that a capitalization rate of 11-12% is appropriate to the Harrison Property as a hypothetical assisted living facility. Based on these factors, I believe that the Income Approach utilized in the O'Malley Appraisal significantly overstates the value of the Harrison Property.

f. Cost Approach: The O'Malley Appraisal uses four land "comparable" assisted living facilities in order to value the Harrison Property. Again, the O'Malley Appraisal fails to address the recent significant declines in land values as a result of deteriorating market conditions. The O'Malley Appraisal relies most heavily on two active listings, which is not a good method for estimating value because of the often unrealistic expectations of sellers in this market. Replacement costs were estimated using an inappropriate cost guide property type, which overstates the actual reproduction cost of the Harrison Property. A physical deterioration factor of 8% was used in the O'Malley Appraisal, which is low considering the building is 75 years old. Moreover, no deductions were made for functional or external obsolescence. In my opinion, there is significant functional obsolescence in the Harrison Property given the lack of private bathrooms or kitchens in the units and the significantly smaller average unit size (assuming the 156 units used by the O'Malley Appraisal). Also, external obsolescence exists with the Harrison Property as it relates to the existing depressed market conditions. Again, no market overview of assisted living properties was presented in the O'Malley Appraisal. Considering these factors, I believe that the Cost Approach significantly overstates the value of the Harrison Property.

g. In summary, all three approaches used by O'Malley Appraisal provide hypothetical values for the Harrison Property that are to high. I believe that the conversion of the Harrison Property to assisted living units is not financially feasible given the current market conditions. Further, such a use does not represent a conforming proposed use given that the zoning allows only for 50 units and that onsite parking is required. In my opinion, the highest and best use of the Harrison Property continues to be as an SRO hotel, subject to renovation of the 3rd, 4th and penthouse floors to bring them to rentable condition.

Case: 09-51900   Doc# 249   Filed: 04/12/10   Entered: 04/13/10 08:45:08   Page 5 of 10

8. Some of the particular statements within the O'Malley Appraisal that do not support the estimated value of the Harrison Property as improved include:

    a. Sales Comparison approach (pages 27-31). In general, the O'Malley Appraisal made no adjustments for market conditions or any other item of physical or locational differences to any of the "comparable" sales. There have been significant decreases in commercial property values since the end of 2008. Capitalization rates for leased investments have increased about 150 to 250 basis points depending upon property type.

    b Sales Comparison approach (Page 27). Sale 1 is a newer, modern facility located in proximity to the Harrison Property. This "comparable" property sold at a 3.1 gross revenue multiplier (GRM) and a 8.7% capitalization rate. The only adjustment made in the O'Malley Appraisal was that the Harrison Property would support a GRM of 3.0 and a capitalization rate of 9.0%, presumably only for the newer effective age of the comparable property. This is not a good comparable for the subject due to its modern design and newer effective age and the adjustments suggested are far to modest.

    c. Sales Comparison approach (Page 28). Sales 2 through 4 are three additional sales of older facilities. Again, no specific adjustments were made to these "comparable" sales. At minimum, adjustments for declining market conditions are warranted. Commercial values have declined significantly since late 2008, and investors yield expectations have increased significantly, which means significant declines in value. Further, financing for investment properties is virtually non-existent, especially for business-oriented properties such as hospitality and assisted living properties.

    d. Sales Comparison approach (pages 27-31). All of these "comparable" sales were financed with the exception of Comparable 3, however Comparable 3 was part of a 5-building portfolio and there is no discussion of how this may have affected the purchase price. Again, lack of financing in today's market is one of the factors driving values down. The ratio of gross building area per room is a good indication of overall conformance to the market in a physical sense. The Harrison Property's assumed 156-room assisted living facility equates to 267 square feet per gross building area. This compares to the comparables below:

-6-

Case: 09-51900    Doc# 249    Filed: 04/12/10    Entered: 04/13/10 08:45:08    Page 6 of 10

1) The "comparable" sales range from 331 to 749 square feet per room, however Sale 4 is calculated on the number of beds, not rooms, so this number may be higher if there are shared rooms. Nevertheless, the Harrison Property is significantly inferior to all of the comparable properties in this regard and the O'Malley Appraisal makes no adjustments whatsover for this.

2) The O'Malley Appraisal concludes a value of $90,000 per unit from the sales comparison approach. The adjusted unit price of the Harrison Property - as improved - should be significantly lower than the range of comparable properties given the deteriorated market conditions as well as the inferior overall quality of the assumed 156-unit assisted living facility.

e. Income approach (pages 32-37). Again, the O'Malley Appraisal has made no adjustments to the rent figures derived from the "comparable" properties. Four such assisted living facilities are presented as comparable, with a description of services as well as rental ranges. All of these "comparable" properties have either private or semi-private rooms, as compared to dormitory-style shared restrooms for the Harrison Property.

1) Comparable 1 offers individual apartments with a private restroom and limited kitchen area, which are far superior to the Harrison Property's configuration. The stated rent range is $2,500 to $4,000 per month. Because of the Harrison Property's much smaller rooms, common restrooms, and lack of private kitchens, a realistic rental rate would be well below the low end of this comparable's range.

2) Comparable 2 is a convalescent hospital, which is not a comparable to an assisted living facility. Convalescent hospitals provide a significantly higher degree of nursing care and are consequently more costly (higher rental) than assisted living. This is simply not a comparable property.

3) Comparable 3 is an assisted living facility in San Leandro with private and semi-private apartments and rental rates starting at $1,800 (semi-private) to $2,300 (private). Again, because of the Harrison Property's inferior configuration, it is likely that a concluded rental rate for the Harrison Property would be well below the low end of this comparable's range.

Case: 09-51900   Doc# 249   Filed: 04/12/10   Entered: 04/13/10 08:45:08   Page 7 of 10

4) Comparable 4 represents a newer, modern Sunrise Assisted Living facility with superior amenities. The property is significantly superior to the Harrison Property and rental rates for the Harrison Property would therefore be significantly less. The description of this comparable on pages 35-36 sounds like it was copied directly from Sunrise's marketing material.

5) Without making any specific adjustments, the O'Malley Appraisal concludes that the Harrison Property as improved would generate rent of $2,500 per room per month. The table on page 36 again illustrates that the Harrison Property's average room size is less than half of the average size of the comparable properties. Moreover, the Harrison Property's lack of private restrooms or kitchens warrants a significant downward adjustment. For all of these reasons, it is my opinion that, were the Harrison Property built out as the O'Malley Appraisal proposes, the market rent would be significantly less than $2,500 per unit, per month.

  f. Income approach (Page 37). The O'Malley Appraisal goes through a very short income analysis using the (overstated) concluded gross rent. The vacancy factor of 5% used by the O'Malley Appraisal is not derived from the market. Operating expenses were taken from the "comparable" properties, which are not very comparable, but are in line with typical expense ratios of assisted living facilities. Again, increasing capitalization rates in today's market is not discussed in the O'Malley Appraisal, and, taking that into consideration, the capitalization rate used in the O'Malley Appraisal is far to low. Because the O'Malley Appraisal uses high market rent and a capitalization rate that is to low, the Harrison Property has been significantly over-valued. It is also noteworthy that, the O'Malley Appraisal states on the first page of the transmittal letter that there is no business value in the appraisal, yet it is indeed valuing the Harrison Property subject to gross revenues from a business operation.

  G. Cost approach (pages 38-45). Four land sales were utilized for the cost approach by the O'Malley Appraisal. The most recent is Land Sale 1 which sold for $53 per square foot. The O'Malley Appraisal notes that this "comparable" has a superior zoning yet makes an overall 100% upward adjustment to the comparable for the Harrison Property's superior location. This implies an over 100% adjustment for location. Any comparable requiring over

-8-

100% adjustment for a single attribute is simply comparable.

  H. Cost approach (pages 38-45). The O'Malley Appraisal's discussion of any adjustments is limited and there are inconsistencies. For example, the O'Malley Appraisal makes a downward adjustment for Comparable 3 for its listing status, but not to Comparable 4. Sale 4 sold in 2006 with entitlements for 24 residential condo units. The O'Malley Appraisal fails to make a downward adjustment for market conditions. Land values have decreased significantly since 2006. The O'Malley Appraisal placed the most weight on the two listings and concludes a unit value of $175 per square foot for the Harrison Property. In this market, many sellers are unrealistic in terms of value and are reluctant to lower their asking prices to meet a buyer's expectations. Relying solely on listings for a land value may lead to over-valuing the site. I am personally aware of a land sale in San Leandro which closed in 2007 and was approved for 51 senior apartment units, **which sold at $49 per square foot**. This would be a much better comparable in my opinion. Overall, the O'Malley Appraisal has overstated the land value of the Harrison Property.

  I. Cost approach (Page 41). The O'Malley Appraisal uses the Marshall & Swift cost guide based on a good Class C retirement community complex, which has a base construction cost of $140 per square foot. The description of a "Retirement Community Complex" is one in which each unit has its own kitchen and bath. A better category to use would have been "Elderly Assisted Living," which has smaller apartments and less amenities, at a base cost of $99 per square foot. Thus, the replacement cost used by the O'Malley Appraisal is obviously overstated in this regard.

  J. Cost approach (Page 43). The O'Malley Appraisal estimates an effective age of only 10 years after the renovation, which is underestimated for a 75-year old building. The appraiser concludes a physical deterioration of 8%, which is significantly under-estimated.

  K. Cost approach (Page 43). The O'Malley Appraisal notes no functional obsolescence in the Harrison Property's improvements. There is in fact significant functional obsolescence with regard to the inferior room configuration, and lack of private restrooms or kitchens.

L. Cost approach (Page 44). The O'Malley Appraisal notes no external obsolescence, and that supply and demand are in balance. However, there is absolutely no market data provided to support this conclusion and the contrary conclusion is indicated by the current market conditions.

M. In summary, based on the overstated land value, overstated replacement cost, and understated depreciation of the Harrison Property, the O'Malley Appraisal significantly overvalues the Harrison Property under the cost approach.

N. <u>Reconciliation and As Is Value</u>. The O'Malley Appraisal concludes a final value of $13,500,000, "subject to completion." At page 46, the O'Malley Appraisal makes adjustments to reflect the income loss and costs associated with bringing the property to stabilized occupancy. The O'Malley Appraisal assumed a six-month lease-up time without any market support. In this current depressed market, such absorption time may very well be longer. The O'Malley Appraisal then makes the deduction for estimated construction costs as well as profit, and concludes an "as-is" value of "as improved" Harrison Property is $7,500,000. As demonstrated above, the O'Malley Appraisal has overstated the hypothetical value of the Harrison Property as improved under each of the sales, income and cost approaches. Moreover, the O'Malley Appraisal's conclusion of highest as best use is not supported.

9. On February 12, 2010, I conducted an inspection of the Harrison Property. Prior to and thereafter, I had personally gathered data from which Hulberg could evaluate the highest and uses for the Harrison Property as well as provide Lone Oak with an estimate of its market value.

10. Based upon my review, analysis and inspection, I prepared and signed the written appraisal report for the Harrison Property attached hereto as Exhibit "C" on behalf of Hulberg.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 12, 2010, at San Jose, California.

_____
BRIAN K. RAPELA

-10-

Case: 09-51900    Doc# 249    Filed: 04/12/10    Entered: 04/13/10 08:45:08    Page 10 of 10