**ORIGINAL**

Benyam and Paula R. Mulugeta
1025 Harker Ave.
Palo Alto, Ca. 94301
Tel: 650-906-8012
Email bmulugeta1020@gmail.com

Debtors in Possession

**FILED**

JUL 1 9 2011

CLERK
UNITED STATES BANKRUPTCY COURT
SAN JOSE, CALIFORNIA

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re:                                    )
                                          )
Benyam and Paula R. Mulugeta             )    Case No. 09-51900 ASW
                                          )    CHAPTER 11
                                          )
              Debtors                     )    Date: July 25, 2011
                                          )    Time: 2:15 p.m.
                                          )    Room: 3020
                                          )    Location: 280 S. First Street
                                          )              San Jose, Ca.
                                          )
                                          )    Judge: The Honorable A. Weissbrodt

### DEBTORS OPPOSITION TO LONE OAK FUND MOTION FOR RELEIF FROM THE AUTOMATIC STAY

Debtors, Benyam and Paula R. Mulugeta (jointly "Debtors") submit this opposition to the Motion for Relief from Automatic Stay submitted by Lone Oak Fund regarding Debtor's Real property located at **2332 Harrison St. Oakland, Ca. 94612 "Harrison";** for the following reasons:

### I-    Introduction:

Debtors filed Chapter 11 in March 18, 2009, in order to get protection from bankruptcy court, granted to them through "Automatic Stay"11 U.S.C. 362. The automatic stay has helped Debtors to stop Lone Oak Fund from foreclosing and takeover "Harrison" which is the life line of Debtors estate, and saved the estate from collapsing. In addition, it helped Debtors to start reorganizing and have a second chance, which the Code intends to achieve. There is no good cause exist as the Debtors will show in this opposition for the Court to terminate the automatic stay at this stage.

## II-    STATEMENT OF FACTS:

### A- Mr. William Purcell Opinion of Value:

Debtors strongly dispute Mr. Purcell opinion of value of "Harrison" because of the following ground:

i-    Debtors believe in Chapter 11 cases a full fledge appraisal from an independent person, not from a person who has deep interest on the property like Mr. Purcell has , is require by the Court to make a ruling.

ii-    No legitimate intuition (i.e. lender or bank) make a decision or give a loan to a borrower based on opinion of value of a real estate broker, Debtors submit why Lone Oak Fund expects this Court should make decision on Debtors' estate based on the opinion of a real estate broker, Mr. Purcell, who has interest on the property.

iii-    Debtors submit that Mr. Purcell has been interested on the property long before Debtors filed Chapter 11, now he tries to take advantage of the Debtors financial difficulties by low bowling the value the property to benefit himself and /or his investors.

### . B) The Appraised Value of the Property:

The property was appraised  by Detailed Analysis certified MAI appraiser, who does not have any interest  on the property like Mr. Purcell , on October 9, 2010 "As is Value Estimate" $7,500,000 and "Value Subject to renovation" is $13,500,000.00 .(Exhibit 1).

### C)  Equity and a necessary element the "Harrison" property has to Debtors' reorganization plans

Lone Oak Fund's motion attempts to argue that there is not equity in "Harrison" property and as such it is not necessary to Debtors' reorganization plan. Debtors strongly reject Lone Oak Fund's claims. As the evidence shown in this opposition, the appraisals done by third and independent party for prospective buyers, the purchase offers received by Debtors before and since filing Chapter 11, including the appraisal received at the time of Lone Oak Fund's 2006 funding, and the fact the property maintained its value in spite of the current economy environment indicates that there is sufficient equity and thus the interest of Lone Oak Fund is very well protected.

Here are the facts:
Fair Market Value "As Is"            $7,000,000.00 (Exhibit 1)
Loan Amount to Lone Oak Fund      $3,500,000.00** undisputed amount (Exhibit 2)

| | |
|---|---|
| Bob Taylor 2nd | $250,000.00 (est.) |
| Tomko Nakama | $230,000.00 (est.) |
| Property Tax | $336,000.00(est.) |
| | |
| Total Owed. | $4,316,000.00 |

**Equity**                          **$1,684,000.00+**

Note, if the property sold at a minimum for $ 6,000,000 there is still over $1,600,000 left to pay off other creditors and the unsecured creditors. However, if Lone Oak Fund is allowed to foreclosure none of the junior lien holders and the unsecured creditors will get a dime, and Debtors ability to organize will be jeopardize.

   **The Note provided for interest payments by Debtors $28,875.00 per month which Debtors have been paying since getting the loan in 2006. Since October, 2006 Debtors had paid over $1,500,000.00 to Lone Oak Fund on interest payment only; and the value of the property is way over what is owed to Lone Oak Fund

D) <u>**The Property is listed for Sale**</u>

   The property is listed with TRI Commercial; there are few interested buyers who are working to put together offers.

E) <u>**Investor and Refinance**</u>

   Debtors are working also with investors to improve and remodel the 3rd, 4th and 5th floor in order to increase the income of the property and increase the value of the property significantly. At the same time is working with lender to refinance to pay off Lone Oak Fund.

F) <u>**Reorganization**</u>

   Debtors believe that "Harrison" is essential for Debtors reorganization. Debtors are in the process of filling Amended Plan and Disclosure Statement for August 26, 2011 hearing, to prove that "Harrison" is essential for Debtors' reorganization plan and the survival of the estate.

G) <u>**Debtors are entitled to a Full Evidentiary Hearing after Discovery**</u>

   Debtors are entitled to a full evidentiary hearing on the issues asserted by Lone Oak Fund after discovery, namely discovery regarding the actual value of the "Harrison" property. Debtors require discovery into the self-serving "valuations" provided by Lone Oak Fund. Debtors also require discovery into Lone Oak Fund's actions in advertising the "Harrison" property for sale prior to its ownership and the impact Lone Oak Fund's action has on Debtors' ability to fully market and sell the property.

## H) **Adequate Protection**

Debtors will continue to make adequate protection payment from the current "Harrison" income $11,000.00 on the 15th of each month with 5 days cure period, until the plan is confirmed or sale or refinance the property. Debtors will increase the adequate protection payment once the 3rd and 4th floor are rented since there will be more income.

## VI-Conclusion

Debtors submit that Lone Oak Fund fell to prove under Bankruptcy Rules 362(d)(1)that Debtors property "Harrison" does not have equity and not essential for Debtors reorganization plan. The Bankruptcy Code specifically states that the moving party, in this case Lone Oak Fund, must establish its prima facie case. Failure to prove a prima facie case requires denial of the requested relief. Debtors believe the exaggerated and disputed figures used by Lone Oak Fund in the motion can be prove wrong once the Court grants Debtors a full evidentiary hearing . Therefore, Debtors are entitled to continued protection of the Court.

In addition, Debtors believe that Lone Oak Fund knows that the property Fair market Value is well over what is owed to Lone Oak Fund, therefore if they succeed in their pursue of taking over of the property at a minimum they will make over $1,000,000.00+ above and beyond what Debtors owe to them. That is why they keep coming and try to take this property from day one and wipe out the Debtors, and the other creditors. Since October, 2006 Lone Oak Fund has collected from Debtors over $1,500,000.00 in interest payment alone, and Lone Oak Fund knows that the Fair Market Value of the property is way over what is owed to them. Why then these endless motion for relief rather than working in good faith with Debtors?
 Further, Debtors proposed the following: a) if there is no offer on "Harrison" the next 90 days, b) the Plan and Disclosure Statement is not confirmed, c) Debtors cannot be able to get the protection they need in the bankruptcy court, and no good cause exist, Debtors will file motion to dismiss their case in order to pursue other legal venue.
 **Based on the forgoing**, Debtors submit that the property has equity above Lone Oak Fund secured claim (undisputed), proper discovery and a full hearing will establish the Lone Oak Fund's equity cushion, and no good cause does exist to grant relief from stay.


Dated: July 19, 201

_____

Benyam Mulugeta
Debtor

# EXHIBIT 1

# DETAILED ANALYSIS

Real
Estate
Appraisers
&
Investment
Analysts

October 15, 2010

Duduwa General Services Nigeria Limited
Mr. Sani Ibramim, CEO
Mr. Ted Osigwe
Ms. Mary Bewell
Mr. Cypiam Banki
Mr. Perry B. Morouway
2332 Harrison Street
Oakland, California 94612

Re:   2332 Harrison Street
      Oakland, California

Gentlemen:

As you requested, an investigation was made to provide you with an opinion of the market value of the above referenced property.

Per your request I have made a value estimate of the subject property, which is based on an estimated renovation cost of $3,000,000. The subject property is an old hotel which has 156 rentable rooms and which is located in the heart of Oakland, California. At present the owner has partially renovated the ground and second floors and the property is being rented out on a weekly basis. The building frame is solid concrete and thus the subject can be easily renovated by renovating the interior rooms. I have been given an estimated budget for this work of $3,000,000 or about $18,900 per room.

This appraisal has been prepared for the exclusive use of Duduwa general Services Nigeria Limited for mortgage financing and asset management purposes. The assignment has been conducted in conformity with Title XI of the Federal Financial Institution's Reform, Recovery, and Enforcement Act (FIRREA) and its regulation. My appraisal activities and reporting are in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation. My appraisal activities and reporting conform with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute. Finally, we meet all the requirements of the Competency Provision of the current USPAP, specifically in having appraised similar properties.

The enclosed appraisal is a SELF-CONTAINED report. The appraised value does not include personal property. There is no business interest.

I would like to outline the source of data utilized in this report. Comparable sales were taken from CoStar Comps and Mr. Christopher Frasco. Comparable rental data was taken from California Nursing Home Search (calnhs.org), from assisted-living.aplaceformom.com, and gilbertguide.com. Land comparables were taken from CoStar Comps.com.

Market Value, as defined in the body of this report, is summarized as:

*The most probable price in terms of money which the property will bring in a competitive and open market under all conditions requisite to a fair sale.*

Based on the analysis presented in this report, it is my opinion that the market value of the Fee Simple Estate of the subject property, subject to the assumptions and limiting conditions cited in this report, as of October 9, 2010 and predicated on an estimated exposure time of up to 12 months, is:

| | |
|---|---|
| **AS IS VALUE ESTIMATE** | **$7,500,000** |
| **VALUE SUBJECT TO RENOVATION** | **$13,500,000** |

We hereby certify:

(1) We have no interest in this property, past, present or prospective.

(2) Our fee for the investigation and preparation of this report is not contingent upon the amount of value herein reported.

Respectfully submitted,
DETAILED ANALYSIS, INC.

Patrick J. O'Malley, MAI
Certified General Real Estate Appraiser
AG002523

**APPRAISER'S CERTIFICATION**

## I. CERTIFICATION

The undersigned does hereby certify that, except as otherwise noted in this appraisal report:

* We have no present or contemplated future interest in the real estate that is the subject of this appraisal report.

* We have no personal interest or bias with respect to the subject matter of this appraisal report of the parties involved.

* To the best of our knowledge and belief, the statements of fact contained in this appraisal report, upon which the analyses, opinions and conclusions expressed herein are based, are true and correct.

* The appraisal report sets forth all of the limiting conditions (imposed by the terms of our assignment or by the undersigned) affecting the analyses, opinions and conclusions contained in this report.

* The appraisal report has been made in conformity with and is subject to the requirements of the Code of Professional Ethics and Standards of Professional Conduct of The Appraisal Institute.

* Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

* Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

* No one other than the signer(s) prepared the analyses, conclusions and opinions concerning real estate that are set forth in this appraisal report. The property was inspected by Patrick J. O'Malley, MAI on April 17, 2009 and October 9, 2010.

* This appraisal report complies to the current Uniform Standards of Professional Appraisal Practice of the Appraisal Standards Board (USPAP) and current regulations CFR Parts 208, 225 and 323 as set forth in Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). This appraisal assignment was not based on a requested minimum or specific valuation.

* The appraisal institute conducts a program of continuing education for its designated members. Patrick J. O'Malley, MAI, has completed the requirements of the continuing education program of the Appraisal Institute.

## II. RESTRICTION UPON DISCLOSURE AND USE

* Disclosure of the contents of this appraisal report is governed by the By-laws and Regulations of The Appraisal Institute.

* Neither all or any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or the firm with which he or she is connected, or any reference to The Appraisal Institute or to the MAI or RM designation) shall be disseminated to the public through advertising, public relations, news media, or any other public relations, news media, or any other public means of communication without the prior written consent and approval of the undersigned.

_Patrick J. O'Malley_

Patrick J. O'Malley, MAI
AG002523
Dated _10/15/2010_

## EXECUTIVE SUMMARY

| | |
|---|---|
| Location | 2332 Harrison Street<br>Oakland, California 94612 |
| Purpose of the Appraisal | To form an opinion of the Market Value of the Subject Property. |
| Property Rights Appraised | Fee Simple Estate |
| Type of Property | Proposed Assisted Living Facility |
| Improvements | The subject property is an old, 4-story Class B reinforced concrete hotel with 159 rooms. The building has a gross building area of 42,760 square feet. The size of the rooms totals 30,300 SF or 191 SF per room. There is no on site parking. |
| The Site | The site measures 13,300 SF (0.31 acres) |
| Quality of Construction | Good |
| Overall Condition | Good subject to renovation |
| Remaining Economic Life | 40 years subject to renovation |
| Zoning | C-30 S4, District Thoroughfare Commercial Zone. |
| Highest and Best Use | Proposed Use |
| Date of Value Estimate | October 9, 2010 |
| Census Tract | 4037.00 |

## INDICATORS OF VALUE

| | |
|---|---|
| Market Data Approach | $14,040,000 |
| Unit of Comparison | 3.0 x gross |
| | |
| Income Approach | $13,472,000 |
| Stabilized NOI | $1,212,480 |
| Overall Capitalization Rate | 9.0% |
| | |
| Cost Approach | $13,850,000 |
| Land Value | $ 1,729,000 |
| Improvement Value | $12,121,000 |

## VALUATION CONCLUSION

Final estimate of the market value of the subject property:

| | |
|---|---|
| **AS IS VALUE ESTIMATE** | **$7,500,000** |
| **VALUE SUBJECT TO RENOVATION** | **$13,500,000** |

# **TABLE OF CONTENTS**

**INTRODUCTION**
 Title Page     i
 Letter of Transmittal     ii
 Appraiser's Certification     iii
 Summary of Facts and Conclusions     iv
 Table of Contents     v
 Contingent and Limiting Conditions     vi

**THE REPORT**
 <u>The Subject Property</u>
 Identification of the Property     1
 Purpose of the Appraisal     1
 Intended Use and Intended User of the Appraisal     1
 Definition of Value     1-2
 Scope of the Assignment     2
 Property Rights Appraised     2
 Date of the Value Estimate     3
 Property Inspection     3
 Competency Rule     3
 Hypothetical Assumption     3
 History of the Subject Property     3
 Ownership     3
 Regional Analysis     4-7
  Regional Map
 City Analysis     8-11
 Neighborhood Analysis     12-13
  Neighborhood Map
 Analysis of Long-Term Care Facilities for the Elderly     13-14
 Zoning & Taxes     15-16
 The Site     17-19
  Plat Map
 The Improvements     20-22
  Building Sketch and Photographs
 Highest and Best Use     23-25

**VALUATION AND ANALYSIS**
 Methodology of the Appraisal Process     26
 The Direct Sales Comparison Approach     27-32
  Area Map of Comparable Sales
  Photographs of Comparable Sales
 The Income Approach     33-38
  Area Maps of Comparable Rentals
  Photographs of Comparable Rentals
 Land Value Analysis     39-42
  Land Sales Map
 The Replacement Cost Approach     42-46
 Reconciliation of Value Indicators     47-48

ADDENDUM

Assessor's Data
Zoning Ordinance
Qualifications of Patrick J. O'Malley, MAI
Qualifications of Nannette F. Quigley

## ASSUMPTIONS AND STANDARD LIMITING CONDITIONS

1. The legal description furnished to the appraisers is assumed to be correct, and the title is assumed to be marketable.

2. The appraisers assume no responsibility for legal matters.

3. Report exhibits are only visual aids. All sizes indicated for land and improvements are from indicated sources and assumed to be correct.

4. Unless otherwise noted herein, it is assumed there are no detrimental easements, encumbrances, encroachments, liens, zoning violations, building code violations, or environmental violations, etc. affecting the subject property.

5. Information, estimates, and opinions furnished to the appraisers are obtained from sources considered reliable; however, no liability for their accuracy can be assumed by the appraisers.

6. The integrity of the site is assumed to be adequate to support any described improvements. It is assumed that there are no toxic materials within the site or the improvements that would reduce its utility, development potential, marketability or value. All improvements are assumed to be structurally sound unless otherwise noted.

7. Responsible ownership and competent management are assumed.

8. Where the discounted cash flow analysis is utilized, it has been prepared on the basis of the information and assumptions stipulated in this appraisal report. The achievement of any financial projections will be affected by fluctuating economic conditions and is dependent upon the occurrence of other future events that cannot be assured. Therefore, the actual results achieved may well vary from the projections and such variation may be material.

9. The appraisers are not required to give testimony or appear in court, or at public hearings, or at any special meeting or hearing with reference to the property appraised herein by reason of preparation of this report, unless arrangements have been made prior to preparation of this report.

10. Possession of this report does not carry with it the right of publication. It shall be used for its intended purpose only and by the parties to whom it is addressed. Neither all nor any part of the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media without the written consent or approval of the authors. This applies particularly to value conclusions, the identity of the appraisers or firm with which it is connected, and any reference to the Appraisal Institute, or MAI designation.

11. Except as discussed in the body of this report, the appraisers take no responsibility for and reaches no final conclusions regarding indirect costs of a project based on political processes including planning and other government functions whereby changes in standards of construction, density, etc. can occur; indirect charges for highways, education, or numerous other items can be charged to a project; or various moratoria can delay a project. Government processes can change suddenly and substantially affect costs

and project values, and users of this report are cautioned to make their own inquiry and judgment regarding these matters.

12. The appraisers are not experts in law, macroeconomics, or any field of specialization other than appraisal and bases all considerations of the future (such as inflation rates, vacancy factors, absorption rates, etc.) upon a reasonable use of data and opinions of others to derive usable opinions only for the purpose of customary appraisal calculations and assumes no responsibility for predicting actual events.

13. Due to ever-changing economic, financial, and other business conditions, the appraisers assume no liability for the owner/client/borrower finding a buyer or obtaining financing at the appraised value.

14. The Appraisers assume that there are no toxic or hazardous material present in the soil, subsoil, structures of the property, or in the environment affecting the property, which would render it more or less valuable. The Appraisers have no expertise which enables him or her to discover or take notice of toxic or hazardous materials or the effects of such materials; and the Appraisers shall have no responsibility to the presence or effects of toxic or hazardous materials on, in, or affecting the property.

15. The appraisers assume that the improvements are adequately designed from an engineering perspective for their intended use and that there are no latent or design defects which would otherwise render the improvements less valuable. The reader should be aware that the appraiser is not a qualified engineer and is not competent to render an opinion concerning engineering and design of the improvements.

## ADDRESS OF THE PROPERTY

The subject of this appraisal is certain real property known as:

### A Proposed Assisted Living & Care Facility
### 2332 Harrison Street
### Oakland, California 94612

Which is known as Alameda County Assessor's Parcel Number 010-0768-005.

## LEGAL DESCRIPTION

A legal description of the subject can be found in the title report located in the addendum.

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to form an opinion of the "As Is" and "As If Complete" values of the subject as of the date of inspection.  The **"As Is" Value** will take into consideration work done to the site as of the date of valuation, zoning, the approvals granted and feeds paid to date.  The **"As If Complete" Value** is based on the hypothetical condition of the $3,000,000 million renovation work being completed as of the valuation date of appraisal.  The values are not prospective values, but current values, as of the date of valuation.

## INTENDED USE OF THE APPRAISAL

The intended use is to support a value for acquisition purposes.

## INTENDED USER OF THE APPRAISAL

The intended user of the appraisal is Duduwa General Services Nigeria Limited..

## DEFINITIONS

The term *Market Value* as used in this report is defined as:

*The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer* under conditions whereby:

a.    *buyer and seller are typically motivated.*

Case: 09-51900    Doc# 482    Filed: 07/19/11    Entered: 07/20/11 06:56:26    Page 16 of
23

b.   *both parties are well informed or well advised, and each acting in what he considers to be his own best interest.*

c.   *a reasonable time is allowed for exposure in the open market.*

d.   *payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

e.   *the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*[1]

### Market Value "As Is"

*The definition of this value is an estimate of the market value of a property in the condition observed upon inspection, and it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date of inspection. This value incorporates not only the physical aspects, but the legal and economic characteristics as well.*[2]

## PROPERTY RIGHTS APPRAISED

The property rights appraised are an unencumbered fee simple ownership. The individual property interests are defined as follows:

**Fee Simple (Interest) -** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations of the four powers of government (eminent domain, escheat, police power and taxation).[2]

## SCOPE OF THE ASSIGNMENT

The scope of this appraisal is an analysis of the zoning regulations, economic conditions, physical adaptability of the property, regional and neighborhood trends, land sales, improved sales, rental and operational data, cost of construction data and the inspection of the subject property and market data. All market data is verified either by the buyer, seller, broker, deed, title company and/or leasing agent as may be appropriate. The accumulated data is summarized in the report and then is processed into values by the consideration of the three approaches to value: cost, market data and income approaches. The appraisal report was then completed in accordance with the standards and provisions dictated by FIRREA and the Uniform Standards of Professional Appraisal Practices (USPAP).

---

1 *The Appraisal of Real Estate*
2 *The Appraisal of Real Estate*

Case: 09-51900      Doc# 482      Filed: 07/19/11      Entered: 07/20/11 06:56:26      Page 17 of 23

## DATE OF VALUE ESTIMATE

The valuation applies to conditions existing in the market place on October 9, 2010

## PROPERTY INSPECTION

The site was inspected by Patrick J. O'Malley, MAI on October 9th, 2010.

## COMPETENCY RULE

The appraisers possess both the knowledge and required ability to appraise the subject property. It is within the defined service area of Detailed Analysis, Inc, and the appraisers have the required resources, including zoning information, Assessor's records, and market information to properly prepare the report. The appraisers affiliated with Detailed Analysis, Inc. have appraised numerous properties of a similar type in the area and its competing environment. Please see a copy of the appraiser's qualifications in the Addenda.

## HYPOTHETICAL ASSUMPTION

This appraisal is based on the hypothetical assumption that the subject is converted from a 159-room hotel into a 156-room assisted living & care facility at an estimated renovation cost of $3,000,000.

## HISTORY OF THE SUBJECT PROPERTY

The subject consists of an old 159-room residential hotel known as the Merritt Hotel located in the heart of Oakland.  The owner was planning to sell the subject as a future hotel. The current buyer, however, plans to convert the hotel into a 156-room assisted board & care facility at an estimated renovation cost of $3,000,000 or about $18,868 per room.  At present the owner has partially renovated the first and second floors and the second floor is being rented out on a weekly basis.  The owner acquired the subject property in April 2002 from Lake Merritt Lodge, LLC.  There have been no other sales or listings of the subject for the past 3 years.

## OWNERSHIP

Currently, title to the subject land is vested as follows:

Benyam Mulugeta and Paula R. Mulugeta, Husband and Wife, as Joint Tenants

Case: 09-51900    Doc# 482    Filed: 07/19/11    Entered: 07/20/11 06:56:26    Page 18 of 23

## REGIONAL ANALYSIS

### Alameda County

Geographically, Alameda County is located on the east side of the San Francisco Bay and extends from Berkeley and Oakland to the north to Fremont to the south and Livermore to the west. Encompassing 736 square miles with a population of 1,486,681 (2001 census), Alameda, second only to Santa Clara in the Bay Area, is the fifth most populous county in California. In the 1980's county population grew by approximately 12%. While Oakland is the county seat of Alameda County, most growth has been south toward San Jose along I-880 and the valley communities to the east along Highway 680.

### Topography

Alameda County is an attractive mix of Bay coastline, inland hills and a network of parks and outdoor recreation areas. Alameda County borders almost the entire shoreline of the East Bay and stretches eastward approximately 35 miles past the Diablo Mountains to San Joaquin County.

### The Economy

Alameda has the most diversified industrial base in this part of California. Well over 3,000 industrial plants located in Alameda County employ about 20 percent of the labor force. Historically strong in food processing, automobile assembly and pharmaceuticals, the county's economy in recent years has been fueled by growth in important new areas such as research and biotechnology. Food processing is expected to remain at a stable level; growth is predicted for electronic equipment, apparel, printing and publishing. The services sector is outpacing manufacturing now as Oakland renews its downtown with the construction of office, hotel and convention facilities; and Fremont and the eastern communities increase their commercial activity.

Alameda County is a major distribution and transportation center for Northern California served by all three transcontinental railroads and six major highways, as well as air freight operations in Hayward and the Port of Oakland. The port is the largest, most modern containerized cargo handling facility on the west coast and fifth largest in the world.

Military installations also contribute to the economy. They include an Army Base and Naval Medical Center in Oakland; and the Naval Air Station and Coast Guard Training Center in Alameda. The Alameda Naval Air Station is slated for a phased out closure beginning in 1996.

Case: 09-51900    Doc# 482    Filed: 07/19/11    Entered: 07/20/11 06:56:26    Page 19 of 23

Because of the slow phase out process and government efforts to replace the base with private efforts, no major economic dislocation is anticipated.

Total employment is approximately 820,000 in the county, 23rd largest in the nation, with an average annual growth rate of 2.7%. Most of the heavy industry that characterized the economy historically has been replaced by a diverse manufacturing mix. Numerous companies have been attracted to the area, drawn by the Port of Oakland, lower labor costs, affordable housing and more developable land.

**Largest Alameda County Employers include:**

| Firm Name | Full Time Employees |
|---|---|
| University of California at Berkeley | 13,540 |
| Alameda County | 11,080 |
| Kaiser Foundation/Permanente, No. Ca. | 10,210 |
| Lawrence Livermore National | 8,160 |
| U.S. Navy | 7,320 |
| Oakland Public Schools | 7,130 |
| U.S. Postal Service | 6,620 |
| City of Oakland | 4,770 |
| New United Motor Manufacturing, Inc. | 4,660 |
| Safeway, Inc. | 3,550 |
| Fremont Unified School District | 3,120 |
| Lawrence Berkeley Laboratory | 3,090 |
| Pacific Bell | 2,830 |
| Bay Area Rapid Transit | 2,690 |
| Alta Bates Medical Center | 2,520 |
| Hayward Unified School District | 2,320 |

Often used as an indicator of market quality, effective buying income (EBI) is defined as personal income less personal tax and non-tax payments (also known as disposable income). EBI is also a bulk measurement of market potential indicating the ability to buy. In 1996, Oakland had a median household EBI of $28,788 compared to $39,658 for Alameda County and $35,216 for the State of California. It should be noted, however, that 30% of Oakland's population has an EBI of $50,000 and over.

## Housing

The county's housing stock is widely diverse in style. The Victorian era is well represented in the communities of Albany, Berkeley and Oakland while Fremont characterizes the present-day traditional ranch style homes. The ever-present Spanish influence is seen throughout the county. Small town bungalows still exist and in the eastern part of the county are small ranches; later building includes sophisticated high-rise condominiums. The hills above Oakland and

Case: 09-51900    Doc# 482    Filed: 07/19/11    Entered: 07/20/11 06:56:26    Page 20 of 23

Berkeley provide expansive homes secluded by terrain and trees from the nearby urban atmosphere, while inexpensive mini-condos are available in Hayward and Fremont.

Home prices in Oakland and its surrounding metropolitan communities compare favorably with those in San Francisco, Marin and San Mateo counties. Single-family homes are priced approximately 25% below those in more affluent bay area communities.

## Transportation

Alameda County's transportation network has fostered development of industrial, commercial and residential expansion. Harbor facilities, an international airport, rail service by four carriers, and a highway network of interstate routes and highways have played important roles in the development of the county.

Eight major highways fan out in all directions from Oakland to adjoining counties and across three bridges to San Francisco. Southern Pacific and Union Pacific operate rail terminal facilities in Oakland. Atcheson, Topeka and Santa Fe Railway serves the County from its Richmond switching yards. Amtrak provides passenger service through its Oakland station to Southern California, Sacramento and other destinations.

Local motor coach transportation is provided by AC Transit, which serves East Bay cities and continues into San Francisco via the Bay Bridge. Other bus service is made available by the Central Contra Costa Transit District, the Livermore Transit Corporation and Greyhound bus lines. Oakland and Alameda County are also served by Bay Area Rapid Transit (BART). Oakland International Airport houses 11 airlines with service to over 200 cities worldwide. In Alameda County, traffic through the urban corridor from Albany to Fremont is congested at peak commuter hours but some relief is afforded through BART rapid transit.

The Port of Oakland, an independent agency of the City of Oakland, is the third largest container-ship port on the West Coast. The Port has approximately 680 acres of developed terminal area. The fourth largest seaport in the nation, the Port of Oakland handles 90% of all the containerized cargo that passes through Northern California ports.

Located at the terminus of three transcontinental railroads and four interstate highways, the Port of Oakland is a key West Coast inter modal connection and the hub of Northern California's distribution system.

The $1.52 billion Caltrans project to rebuild, instead of retrofit, the eastern span of the Oakland Bay Bridge (linking Yerba Buena Island and the Oakland shore) was completed in 2004.

Case: 09-51900    Doc# 482    Filed: 07/19/11    Entered: 07/20/11 06:56:26    Page 21 of 23

## Shopping

Large regional shopping centers include Bay Street Emeryville, the South Shore in Alameda, Eastmont Mall in Oakland, Bay Fair in San Leandro, Hub and Fashion Center in Fremont, Southland in Hayward, NewPark in Newark and Stoneridge Mall in Pleasanton.

## Summary/Conclusions

Long range forecasts for Alameda County show it is destined to be an area of continued growth and prosperity, primarily due to problems of its neighboring market areas, San Francisco and Contra Costa counties.

    The high price of living and doing business in San Francisco has driven many corporations to move all but corporate headquarters to the East Bay and the outer suburbs. The influence of the acclaimed University of California at Berkeley has contributed an educated work force to various industries which have incubated high-tech and biotech startups. Many of these have become leaders in their fields. These trends should continue. Thus, regional factors as they impact the subject are all positive in the opinion of the appraiser.

A regional map is found on the following page.

Case: 09-51900     Doc# 482     Filed: 07/19/11     Entered: 07/20/11 06:56:26     Page 22 of 23

# Regional Map



Copyright © and (P) 1988–2006 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Portions © 1990–2006 InstallShield Software Corporation. All rights reserved. Certain mapping and direction data © 2005 NAVTEQ. All rights reserved. The Data for areas of Canada
includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for Ontario. NAVTEQ and NAVTEQ ON
BOARD are trademarks of NAVTEQ. © 2005 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc.