Stanley A. Zolotoff, State Bar No. 073283
 Attorney at Law
300 S. First St. Suite 215
San Jose, Ca. 95113
Telephone (408)287-5087
Facsimile (408)287-7645

Attorney for Debtors

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re: )
)
Benyam and Paula R. Mulugeta ) Case No. 09-51900 ASW
) CHAPTER 11
)
)
Debtors ) **DECLARATION OF DEBTOR IN RESPONSE**
) **TO CAMPEAU GOODSELL SMITH FEE**
) **APPLICATION**
)
) Date: July 12, 2013
) Time: 2:15 p.m.
)
) Judge: The Honorable A. Weissbrodt
_____ )

   **COMES NOW** Debtor Benyam Mulugeta, who makes this declaration on behalf of himself and Paula R. Mulugeta (jointly "Debtors'), in response to the application for compensation ("Application") of Campeau Goodsell Smith ("CGS"), as follows:

   **1-INTRODUCTION**

   Debtors filed Chapter 11 Bankruptcy on March 18, 2009 in pro per, and on April 2, 2009, Debtors retained CGS in their reorganization effort, and to be represented and advised throughout their case and in every phase thereof. Debtors believed that CGS could provide Debtors with representation and advice that would benefit Debtors, their estate, creditors and other parties in interest. For such service CGS sought Court approval of payment of a retainer in the sum of $100,000 in connection with the case. Debtors believed that in order to have successful reorganization it was essential to have knowledgeable and competent legal counsel. The impression we got when we met Scott Goodsell was that he was knowledgeable and competent legal counsel, and that is why we hired him for such high retainer fee of $100,000.00

   **However**, it soon became very clear to Debtors that the reason CGS took the case for such high retaining fee of $100,000, without any downpayment, was that Mr. Scott Goodsell believed

the pending sale of the Harrison Street hotel ("Harrison") for $7,000,000 to Trading Spaces LLC, and anticipated net proceeds to Debtors of approximately $3,000,000, would happen in a very short time; and, consequently, CGS would get its $100,000 retention fee. Once Mr. Scott Goodsell realized that the sale of Harrison was not happening as he expected, he literally abandoned the case and left it to his new and inexperienced lawyer, Mr. William J. Healy to handle the case. Unfortunately Mr. Healy did his best, however, was not able to do the "actual" and "necessary" services that were required to rehabilitate debtors' case, nor was he able to do "substantial contribution" to the case, other than the tasks mentioned in the Application that were for "telephone conference", "prepare email correspondence", "review email" etc. etc. which were mostly clerical in nature. As the result of this poor service and negligence by Mr. Scott Goodsell, the estate was substantially harmed, and debtors languished in bankruptcy court forced to defend themselves, with little knowledge of the system and the law. The lack of care by CGS, and its failure to put the case on the right truck, and its focus only on short gain at the expense of the case, put Debtors in a serious harm and danger of losing everything they worked for the past 30 years.

Once debtors realized that the case was not handled properly by Mr. Healy, they asked repeatedly of Mr. Scott Goodsell, whom debtors agreed to retain, to take over and do the "actual and the necessary services" he promised when he took the case. The repeated requests by Debtors to Mr. Scott Goodsell fell on deaf ears. As the result, Debtors were forced to terminate their relation with CGS before further damage was done to the estate.

## II-DEBTORS RESPONSE TO THE SPECIFIC LINE ITEMS IN THE APPLICATION

1-In the Introduction section, at page 2 of the Application, CGS claimed it "took a lead role in preparing, submitting,..., and represented the Debtors with regard to Debtors' sale of its main asset.." That is not true. The sale of Debtors' main asset was handled by Debtors themselves, and the buyer's agent. The only action taken by CGS in regard to the sale of Harrison was to monitor the status of the sale by "telephone conference" and email,( as stated in CGS Application exhibits) at the expense of the other major actual and necessary services of the case, ie. submitting a Plan and preparing cash collateral, etc..

2- CGS clamed in its Application that it "worked extensively" with Debtors. But doing what? That is also not true.

3-CGS claimed on page 6 of the Application that its service included preparation of monthly operating reports. That is not a true statement. Debtors have been doing their own monthly reports, without input from CGS, since day one of the case.

4-Throughout the Application, CGS used vague and general terms such as "produced documentation", "communicated on various subject" "telephone conference" "strategy options" etc. etc. This is babble, and indicative of CGS' padding of its statement with meaningless time entries.

5- CGS in the "Asset Sales" section, at page 7 of the Application, stated that it "assisted debtors in promoting and prosecuting" the sale of Harrison. That is false. In addition, in the same section, with regard to other possible sales of Harrison, the Application states that these sales "required substantial involvement by Applicant." That is not true. In addition, if one examines Exhibit C of the Application, entitled Asset Sale, the activities mentioned by CGS, to quote a few of them: "telephone conference", "prepare email", etc. etc., are further examples of padding the bill. Further, the Harrison contract of sale was written before CGS was retained, and was handled by Debtors and Mr. Mark Paton, the agent of the buyer. In addition, Mr. Healy had a limited knowledge of real estate transactions to be any help, and that was the problem.

6- In addition, the Application is full of statements and claims that appear to be repeated, often using different vocabulary to explain the same function or activity, seemingly done in order to justify CGS' inflated and outrageous fee request. For example, on April 9, 2009, there is a claim which stated: "prepare email correspondence to Attorney Nunes...". The same entry happened on April 10, 2009 word by word. There are numerous like that throughout the exhibits.

### III- DAMAGE AND HARM DONE TO THE ESTATE AND DEBTORS BY CGS

After CGS realized that the Harrison sale would not happen as expected, it abandoned the case in substance: it failed to file a plan or move for use of cash collateral. Debtors believe, if anything, that CGS owes much more to Debtors for the negligence and malpractice, and harm done to the estate as the result of its failure to abide by the standard of care expected of competent counsel. If CGS would have handled the case ethically and professionally and put it on the right path, the Debtors may have gotten out of bankruptcy on time, and perhaps may not have lost their major holdings: the Harrison, O'Keefe and Grand properties.

### IV-CONCLUSION

**Based on the forgoing**, and the damage that CGS did, compounded by the outrage of failing to provide any hint of a fee request after having been discharged 3 ½ years ago, it would be grossly unfair to compensate CGS. Now, only after debtors have worked hard to propose a plan, and have changed their position by negotiating stipulations and bringing in $100,000 into the

estate, has CGS come forward with a fee request. Its reticence until now is consistent with what Debtors believe was the sense of their retention: essentially a contingent fee based on the quick sale of Harrison. Debtors respectfully request that the Court entirely disallow the fee request by CGS.

Dated: June 17, 2013

                                                  /s/Benyam Mulugeta